IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2022 Session

## STATE OF TENNESSEE v. ADAM O'BRIAN McDANIEL

**Appeal from the Criminal Court for Monroe County**
**No. 17-209CRM    Sandra N.C. Donaghy, Judge**

_____

### No. E2021-00565-CCA-R3-CD

_____

The Defendant, Adam O'Brian McDaniel, was convicted by a Monroe County Criminal Court jury of three counts of rape of a child, a Class A felony, for which he received concurrent twenty-eight-year sentences to be served at 100%. *See* T.C.A. § 39-13-522 (2018) (subsequently amended). On appeal, the Defendant contends that: (1) the trial court erred in determining that he was competent to stand trial, (2) the trial court erred in denying the motion to suppress his pretrial statement, (3) the evidence is insufficient to support his convictions, (4) the State made an improper election of offenses, (5) the trial court erred in admitting the victim's great-grandmother's testimony regarding her reaction to the victim's revelation of sexual abuse, (6) the trial court erred in denying his motion for a mistrial, (7) the trial court erred in giving a jury instruction pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), rather than granting his motion to dismiss based upon the State's loss or destruction of evidence, and (8) the State engaged in improper closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Robert L. Jolley, Jr. (at trial and on appeal), and Charles G. Currier (pretrial), Knoxville, Tennessee; for the Appellant, Adam O'Brian McDaniel.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; Joseph V. Hoffer and Shari Tayloe, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to sexual abuse of his then-five-year-old stepson. The Defendant gave an inculpatory statement to law enforcement, but at the trial, the defense presented its theory that the Defendant, who is intellectually disabled, gave incorrect information in the statement due to the inherent suggestibility of the questioning, that the other evidence did not demonstrate his guilt, and that the child's family fabricated the allegations in the wake of the breakup of the Defendant and the child's mother's marriage.

At the 2019 trial, the victim, age nine, testified that in May 2015, he and his mother lived with the Defendant and that the Defendant began sexually abusing the victim at night when the victim's mother was asleep. The victim said that the Defendant removed the victim's Pull-Ups underwear and "sucked on" the victim's "wee-wee" and that the Defendant made the victim suck on the Defendant's "wee-wee." The victim said his mouth tasted like "[m]oldy bread" after the Defendant forced him to perform oral sex on the Defendant. The victim acknowledged that he had never eaten moldy bread but said he had seen videos of people eating moldy bread, who stated it tasted bad. The victim said that his mother did not allow him to play "Halo," a video game, but that the Defendant permitted him to play the game after incidents of sexual abuse. The victim said the Defendant told him that he could not tell anyone about the abuse.

The victim testified that the abuse occurred twenty-one times and that it took place in the living room. He acknowledged that he used this number because he overheard members of his family state that the Defendant had admitted to twenty-one instances of abuse and that he did not know the number of times it occurred. He later said the abuse occurred seven times per week in May 2015. The victim agreed that he, his mother, and the Defendant slept on a mattress on the living room floor and watched movies in May 2015. He thought this occurred only one night and said no abuse occurred that night.

The victim testified that he decided to reveal the abuse to his great-grandmother when he was at her house. He said he told her because he wanted the abuse to end.

The victim acknowledged that on June 19, 2015, he told Dr. Algianon Jeffero that the Defendant "had only touched." The victim later clarified that he told Dr. Jeffero the Defendant had touched him "in places he shouldn't." The victim said the Defendant touched the victim with the Defendant's mouth. The victim did not remember telling Dr. Jeffero anything else. The victim acknowledged that he had not learned the difference between the truth and a lie until after he and his mother moved out of the home they had shared with the Defendant and into the victim's great-grandmother's house. He agreed that he had not known the difference between the truth and a lie when he talked to Dr. Jeffero. He said he did not remember whether he had been truthful or had lied to Dr. Jeffero. He

-2-

said he did not know what the word "penetration" meant in May 2015 or at the time of the trial.

After the victim answered multiple questions with "I don't recall," he said he learned the phrase from his mother, who told him it meant the person did not remember.

Calhoun Police Lieutenant Wes Martin testified that he was previously employed with the Monroe County Sheriff's Department as a child abuse detective. He said that in his former employment, he began a child sexual abuse investigation on June 19, 2015. He said he responded to Sweetwater Hospital, where he spoke with the victim and had hospital personnel collect evidence for a rape kit.

Lieutenant Martin testified that after he left the hospital, he arrested the Defendant at the Defendant's house. Lieutenant Martin said that about 8:00 or 9:00 p.m. that night, he interviewed the Defendant in the presence of an unidentified Department of Children's Services (DCS) employee and Tina Florey, who was also a DCS employee.

A redacted video recording of the Defendant's custodial interview was received as an exhibit and played for the jury. In it, Lieutenant Martin advised the Defendant of his *Miranda* rights by reciting them in rapid succession. Lieutenant Martin stated that he did not need to have the Defendant sign a written waiver because the Defendant had already done so. Lieutenant Martin advised the Defendant that "we" talked to the victim at the hospital. Lieutenant Martin said a "sexual assault kit" had been collected to preserve any DNA, semen evidence, pubic hair, and "everything." He asked the Defendant if there was anything Lieutenant Martin should know before the kit was submitted for testing. Lieutenant Martin said the victim had stated that the Defendant tried to insert the Defendant's penis in the victim's anus and asked if this happened. The Defendant acknowledged that it had. The Defendant stated that he tried to insert his penis in the victim's anus but that he was only able to insert the top of the head of his penis. Lieutenant Martin drew a penis on a piece of paper and asked the Defendant to mark on the drawing the portion of his penis he had inserted in the victim's anus. In the video recording, the Defendant can be seen marking on the drawing. The Defendant acknowledged that he inserted his penis into the victim's mouth and that about the same portion of his penis was used as in the anal penetration. Pointing to a spot on the drawing at which the Defendant had pointed to indicate the portion of the Defendant's penis which the Defendant had inserted into the victim's mouth, Lieutenant Martin asked the Defendant, "Both of them about right here?" and the Defendant responded, "Yeah." Lieutenant Martin made a mark on the drawing in the spot the Defendant had indicated and asked the Defendant to initial next to it, which the Defendant did. Lieutenant Martin asked the Defendant to sign the drawing, and the Defendant did. When asked how many times these acts occurred, the Defendant responded, "Just that one time. I didn't try no more after that." When asked if he had sucked the victim's penis a couple of times, the Defendant responded, "Yeah."

When asked how many times, the Defendant said, "Once or twice." When asked if he had performed oral sex on the victim "on the two days or was there more than that," the Defendant said, "Nah, it's just the two days." When asked if oral penetration and anal penetration happened on the same day, the Defendant said he was "pretty sure" it had happened the second night. When asked what happened "the first night," the Defendant said he and the victim performed oral sex on each other. The Defendant said the victim did not suck his penis for very long. The Defendant said the victim did not want to do it and thought it was wrong. When asked about the second night, the Defendant said he performed oral sex on the victim at the Defendant's house. The Defendant later agreed the incidents occurred in the bathroom and living room of his house. The Defendant agreed that he "tried to stick it in him" after performing oral sex on the victim on the second night. The Defendant said this occurred "just once."

The Defendant said in the statement that he had been married to the victim's mother for three years, that the victim's biological father was not involved with the victim's upbringing, and that the Defendant had "stepped in." He said that he imposed discipline on the victim when he had the victim's mother's permission.

When asked if he had performed oral sex on the victim more than twice and after being told the victim had said it occurred "at least around six" times, the Defendant acknowledged in his statement that there had been more than two incidents. When asked how many times, he said, "I'd say it's right about that amount." He said that he tried to get the victim to perform oral sex on him "once or twice" but that he did not "bother" the victim after the victim said he did not want to do it. Lieutenant Martin stated that he did not believe the Defendant and that one of the DCS employees said the Defendant's account was inconsistent with what the victim had said. Lieutenant Martin said he thought the victim performed oral sex on the Defendant "at least six times," and the Defendant nodded affirmatively. When asked how long the sexual abuse had been occurring, the Defendant said, "Days." When Lieutenant Martin said, "We are already talking about three to four weeks," and asked how far back the abuse went, the Defendant responded, "I didn't do it for that long." The Defendant said the incidents happened "pretty close together." When Lieutenant Martin asked how many times per week the incidents occurred, the Defendant said oral sex occurred four to five times in the first week, with the victim performing oral sex on the Defendant three or four times, and the Defendant performing oral sex on the victim five or six times. The Defendant denied any anal penetration occurred in the first week. The Defendant said that in the second week, the victim performed oral sex on him four times and that he performed oral sex on the victim two or three times. The Defendant said no anal penetration occurred in the second week, but he later said he thought the anal penetration occurred in the second week. The Defendant said that in the third week, the victim performed oral sex on him once or twice and that the Defendant performed oral sex on the victim twice. The Defendant said nothing else occurred in the third week.

-4-

The Defendant said in the statement that he had only had an erection once during the incidents. He said he did not enjoy committing the acts. When asked why he committed the acts, the Defendant said, "Well, I was raised up doing that." When asked if the acts felt good, the Defendant said, "A little bit." He acknowledged that he had known the acts were wrong. The Defendant said that the sexual incidents began when the victim had been curious and that the Defendant had tried to teach the victim "the steps of being grown up."

In the interview, the Defendant often paused before responding to questions. In response to questions, he asked what the words "oral" and "erect" meant.

Lieutenant Martin testified that the Defendant had marked about one-half inch of the penis drawing as the portion of the Defendant's penis that had penetrated the victim's mouth and anus. Lieutenant Martin said that when he asked the Defendant a second time how much of the Defendant's penis had penetrated the victim's mouth, the Defendant marked the drawing "just past the head of the penis." Lieutenant Martin stated that when he asked the Defendant a second time to mark the drawing to show how much of the Defendant's penis penetrated the victim's anus, the Defendant marked "between the head and the tip."

Lieutenant Martin testified that the *Miranda* admonition he read to the Defendant and the penis drawing would have been placed in the case file, which he gave to Detective Travis Jones when Lieutenant Martin left the sheriff's department's employment after his position was eliminated. He later acknowledged paperwork stating that he had been fired for unsatisfactory work performance. He agreed that the documents he said he gave to the sheriff's department could no longer be located and that to his knowledge, they no longer existed. He agreed that his usual practice had been to make a copy of documents for a separate file but that he did not have the *Miranda* form and the drawing in a separate file.

Lieutenant Martin testified that he had not known when he arrested the Defendant that the Defendant was intellectually disabled. Lieutenant Martin denied that the Defendant's grandmother had informed him at the time of the arrest of the Defendant's disability. When asked about a statement on the jail booking sheet that the Defendant had "a mental health problem," Lieutenant Martin said he had not been the person who provided this information. Lieutenant Martin said "poor English" was the Defendant's only problem of which Lieutenant Martin was aware.

The victim's great-grandmother testified that on June 19, 2015, she was at home with her husband and the victim. She said the victim had been staying with her husband and her since May 25. She said that while she cooked, the teary-eyed victim, who was shaking, approached her and took her hand. She said he made a statement which made her

feel "crushed." She said she bent on her knees and embraced the victim. She said she called her daughter.

The victim's mother's cousin testified that the Defendant had been married to the victim's mother. The cousin said that on a date she did not recall, she received a telephone call and went to her grandmother's house, where she spoke with the victim and the grandmother. The cousin said she made a short recording while the victim spoke. The cousin said she went to the home the victim's mother and the Defendant shared. The cousin said she had a private conversation with the victim's mother, after which the cousin had a conversation with both the victim's mother and the Defendant. The cousin said she played for the victim's mother the recording of the conversation she had with the victim.

Tiffany Taylor, who was previously employed as a registered nurse at Sweetwater Hospital, testified that she provided emergency room care to the victim on June 19, 2015. She said that she spoke with the victim to obtain "details" and that she collected evidence for the rape kit. She said the victim could not identify the dates of the incidents. She said he stated that oral and anal penetration occurred. She said the victim was unable to state the depth of penetration. She said no physical findings were noted relative to anal penetration. She said that any injuries from slight penetration might heal if they had occurred three to four weeks before the examination. She said that she would not expect to recover biological evidence for an assault which occurred three to four weeks earlier. She said the victim identified his "step-father" as the assailant.

Ms. Taylor testified that the victim had been alone with his mother before she entered his hospital room. Ms. Taylor said that she had been present when Dr. Jeffero performed a physical examination of the victim but that she had not been present when Dr. Jeffero spoke to the victim and the victim's mother. She agreed that Dr. Jeffero's notes indicated that the victim had denied anal penetration. She did not recall the victim's having said he "put his penis in anyone's mouth." She agreed that Dr. Jeffero's notes indicated the victim had stated he had been "touched" but that the notes did not state that the victim had been touched with a mouth or penis.

Algianon Jeffero, MD, testified that he was an emergency room physician at Sweetwater Hospital. He said that in this capacity, he evaluated the victim on June 19, 2015. Dr. Jeffero said the normal procedure was for a nurse to speak with and examine a patient separately from a physician. He said that frequently, patients say one thing to a nurse and something else to a physician. Dr. Jeffero said the victim reported "that [the victim's] stepfather had been touching [the victim] inappropriately." Dr. Jeffero said that due to the victim's age, it was difficult to obtain information, but that the victim stated he had been touched "in his private areas." Dr. Jeffero said that based upon the information he received, he did not think the abuse had been a "one-time thing." Dr. Jeffero said that based upon what he understood from the victim, Dr. Jeffero thought the victim had been

touched with the perpetrator's hands and "could have been . . . his penis also." Dr. Jeffero acknowledged that his report did not state what had been used to touch the victim. He agreed that the victim "didn't mention anything about penetration."

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Kim Lowe, an expert in DNA analysis, testified that the examination of the victim's rape kit was performed by a third-party laboratory. The report was received as an exhibit. Agent Lowe said that the samples submitted were negative for the presence of saliva or semen and that the DNA result was inconclusive. She said she would not expect to detect saliva or semen more than six to twelve hours past a sexual assault. She agreed that a DNA sample for the Defendant was not submitted for analysis by the third-party laboratory.

Jason McDaniel, the Defendant's grandfather, testified for the defense that in May 2015, the Defendant; the victim's mother, who was also the Defendant's wife; and the victim lived in a house across the driveway from Mr. McDaniel's house. Mr. McDaniel said he went to the Defendant's house at "all hours of the day, all hours of the night" to help the Defendant build a fire because the Defendant was unable to keep a fire burning. Mr. McDaniel said the Defendant's house had electricity but that the Defendant and the victim's mother did not want to pay an electric bill. Mr. McDaniel said the Defendant, the victim's mother, and the victim slept on a mattress in the living room and that on the occasions he went to the Defendant's house to start a fire, all three of the house's residents were in the living room and not in the house's other rooms. Mr. McDaniel said the woodstove in which he built fires was also in the living room. Mr. McDaniel said that when he went to the house, the victim would be asleep on the mattress and that the victim's mother would be awake, using her cell phone to send text messages or to play video games. Mr. McDaniel said that in May 2015, he went to the Defendant's house almost every night and that he never saw anything "unusual" and never heard any complaints "about any activity." He acknowledged that he stayed at the Defendant's house for about thirty minutes when he went and that he went almost daily.

Frances McDaniel, the Defendant's grandmother, testified that she lived "across the driveway" from the Defendant, the victim's mother, and the victim in May 2015. She said she went to the Defendant's house "at least once or twice" per day to check on him because "he's really slow on everything." She said the Defendant had to be shown repeatedly how to complete tasks. As an example, she said the Defendant had to be shown repeatedly how to turn on the washing machine. She said the Defendant tried to cook on occasion but "didn't do a good job." She said she had helped raise the Defendant. She said that the Defendant could read "some," that he was a poor speller, and that he could print "some." She said the Defendant could use a hammer and was able to use a telephone with the victim's mother's assistance. Ms. McDaniel said that the Defendant was able to send text messages but that they would contain misspellings. She acknowledged that the Defendant had eventually obtained a driver's license and that he drove alone between Madisonville

and Tellico but said she made him call her when he reached a destination. She said the family members tried to have someone accompany the Defendant when he drove.

Ms. McDaniel testified that the Defendant and the victim played outside together in the evenings. She said the victim called the Defendant "Dad," asked to be carried, and told the Defendant that the victim loved him.

Ms. McDaniel testified that in May 2015, the Defendant, the victim's mother, and the victim slept on a mattress in the living room in order to be near the woodstove. Ms. McDaniel testified that she spoke with Lieutenant Martin at the Defendant's house on June 19, 2015, when Lieutenant Martin was about to arrest the Defendant. She said she told Lieutenant Martin that the Defendant was "not all there" and that the Defendant did not "understand."

Ms. McDaniel disagreed that the Defendant was a "big liar" and agreed that he was "honest" and "doesn't make up stories."

Robert Webb testified that he was married to the Defendant's aunt and that he lived near the Defendant. Mr. Webb said that on May 24, 2015, he saw the Defendant and the victim at a birthday party at Ms. McDaniel's house. Mr. Webb said the victim did not appear to be afraid of the Defendant in the approximate two-hour period he observed them together.

Seventeen-year-old A.S.[1] testified that in May 2015, he went to the Defendant's house to play video games with the Defendant and the victim. A.S. said he was age thirteen or fourteen at the time. A.S. said that the victim's mother was usually in a bedroom and that the victim was sometimes in the living room, where the video games were played, and sometimes in a bedroom. A.S. said that he went to the Defendant's house after school and stayed for six to seven hours. A.S. said he sometimes had to help the Defendant understand how to play the games. A.S. said that in May 2015, the victim asked him about playing Five Nights at Freddy's, "a scary game." A.S. said the victim stated that he had "ask[ed] his parents . . . if he could play the game" and that A.S. allowed the victim to play the game. A.S. said he had been at his "mamaw's" house when he allowed the victim to play the game. A.S. said he later learned the victim did not have parental permission to play the game. A.S. said he was never alone with the victim.

Preschool teacher Linda Ghorley testified that the victim had been one of her students and that she interacted with the Defendant as the victim's stepfather. She said that in having the Defendant sign forms for the victim, she had to deal with the Defendant in

---

[1] Because A.S. was a minor, we have identified him by his initials.

the same manner in which she dealt with the three-year-old children in her class. She said she had to read forms to the Defendant and explain them to him. She said the Defendant signed a form if he understood what she had read and explained. She said that if this process were not followed, the Defendant took the forms home for his wife to sign.

Kathryn Smith, PhD, an expert in forensic psychology, testified that she evaluated the Defendant and reviewed records from other professionals. Dr. Smith said the Defendant was intellectually disabled, a term applied to a person with an IQ of 70 or lower. She said that at age seven, the Defendant received an IQ test score "in the low 60s[,] which is in the extremely low range" and that he was placed in special education classes for his entire academic career. She said the Defendant's IQ when evaluated for Social Security Disability benefits at age eighteen was "virtually identical" to the previous score. She said additional IQ scores from testing in 2015 and 2017 "were consistent with the past scores." She said that intellectual disability was a lifelong condition that did not fluctuate throughout a person's life. She said that although intellectually disabled individuals exhibited different characteristics, they were generally "compliant in the face of authority, more acquiescent," meaning "going along and agreeing or saying yes." She said they were typically less sophisticated verbally.

Dr. Smith testified that her evaluation and the reports she reviewed showed that the Defendant had "very low memory functioning, very poor expressive and receptive language, poor reasoning, and poor information processing." She said that other examiners "consistently described [the Defendant] as being limited in his ability to talk and provide answers to questions and clarify things that he had said."

Dr. Smith testified that she administered a standardized memory test to the Defendant, who performed poorly on all three subtests. Dr. Smith said that when she asked the Defendant to repeat back a story she told him, he included facts that were not part of the story she had told him. She said this was called "confabulation" and distinguished it from lying. She said confabulation did not involve intentional deception and was, instead, the product of faulty cognitive processing, whereby information "gets distorted and comes out differently." She stated that the Defendant was "[v]ery limited" in information processing, both in her evaluation and in the previous evaluations performed by other professionals.

Dr. Smith testified that she administered a suggestibility test to the Defendant, which showed that the Defendant was highly susceptible to "falling for leading questions." She said, "He fell for all of them each time." She said that once the Defendant fell for a leading question, "[H]e tends to persist with that answer rather than change it."

After receiving the evidence, the jury found the Defendant guilty of three counts of rape of a child. This appeal followed.

# I

## Competence to Stand Trial

The Defendant contends that the trial court erred in determining that he was competent to stand trial. He argues that the evidence preponderates against the court's determination. The State counters that the court did not err. We agree with the State.

As we will explain, the record reflects that the Defendant's IQ places him in the range of "mild mental retardation," that he attended special education classes in school, that he received a special education diploma upon completion of his high school studies, and that he received Social Security Disability benefits due to his cognitive impairment.

A brief review of the relevant proceedings in the general sessions court on the issue of competency is helpful to contextualize the competency litigation which took place later in the trial court. On recommendation of defense counsel, the general sessions court ordered that the Defendant be evaluated by Eric Engum, PhD, to determine whether he was competent to stand trial. For reasons that are not explained in the record, Dr. Engum's evaluation did not take place for several months, although upon conducting the eventual evaluation, Dr. Engum opined that the Defendant was not competent to stand trial. In the interim, the general sessions court granted the State's motion for the Defendant to be evaluated by Cherokee Mental Health Center for his competency to stand trial and to determine his mental condition at the time of the offenses, as it pertained to the possible applicability of the insanity defense. Dr. Andrew Demick of Cherokee Health Systems stated in his written report that in his opinion, the Defendant was not presently competent to stand trial but that the possibility existed that with proper training, the Defendant might become competent. To this end, Dr. Demick recommended that the Defendant receive training from the Department of Intellectual and Developmental Disabilities (DIDD). Dr. Demick also opined that the Defendant was not, at the time of the offenses, impaired by a severe mental disease or defect which prevented him from appreciating the nature or wrongfulness of his conduct. Thus, evidence did not exist to support an insanity defense. James Murray, PhD, also evaluated the Defendant. Dr. Murray concluded that the Defendant was moderately to severely impaired "at levels likely to prevent his knowingly and competently exercising his rights within the legal process." Thus, in Dr. Murray's opinion, the Defendant "does not appear competent to waive his *Miranda* rights or to stand trial at the present time." Dr. Murray opined, as well, that due to the extent of the Defendant's history of poor academic performance, the Defendant was "highly unlikely" to be trained to a level of competency to stand trial. The general sessions court ordered the competency training recommended by Dr. Demick, which the Defendant completed. After a hearing, the Defendant was determined by the general sessions court to be competent for purposes of conducting a preliminary hearing.

The Defendant was arraigned and bound over after a preliminary hearing, and defense counsel filed a motion "suggesting" that, despite the Defendant's having completed the DIDD competency training and having been determined after a hearing to be competent to stand trial, the Defendant remained incompetent.

The trial court conducted a hearing to determine the Defendant's competency to stand trial. Jason McDaniel, the Defendant's father, testified that the twenty-eight-year-old Defendant received Social Security Disability benefits and had never had a job because "[h]e simply could not do it." Mr. McDaniel said that the Defendant had a driver's license but that Mr. McDaniel provided the Defendant's transportation because the Defendant got lost repeatedly when allowed to drive. Mr. McDaniel said the Defendant was incapable of using a GPS device for navigation.

Mr. McDaniel testified that he had to remind the Defendant to feed the Defendant's pets but that the Defendant would forget if he did not complete the task within fifteen to twenty minutes. Mr. McDaniel said the Defendant had poor memory and was unable to identify the date and time when asked but could read a digital but not an analog clock. Mr. McDaniel said the Defendant knew the Defendant's parents' name, that the Defendant could identify the Defendant's mother's maiden name if he were allowed to think about it for a while, but that the Defendant thought the Defendant's father's "maiden" name was the father's first name. Mr. McDaniel said the Defendant was able to bathe, dress, and feed himself, although the Defendant sometimes had to be reminded to bathe. Mr. McDaniel said the Defendant could make a sandwich but was unable to cook, having placed a fork in the microwave and having almost "blowed it up" despite having been told not to put a fork in the microwave. Mr. McDaniel stated that the Defendant was unable to complete errands and that if Mr. McDaniel asked the Defendant to retrieve an item more than fifty feet away, the Defendant often forgot what he had been asked to do and did not return with the item.

Mr. McDaniel testified that the Defendant could read with difficulty, could write, and had graduated from high school with a special education diploma. Mr. McDaniel said the Defendant was unable to complete a job application when asked to do so by a doctor. Mr. McDaniel stated that he had tried to help the Defendant increase his reading proficiency but that the Defendant could not comprehend what he had read. Mr. McDaniel said that the Defendant was unable to understand and handle money and that it would be easy for others to take advantage of the Defendant.

Mr. McDaniel testified that the Defendant had been married previously. Mr. McDaniel said that the Defendant received divorce documents and that Mr. McDaniel showed the Defendant where to sign the documents.

Mr. McDaniel testified that the Defendant was unable to build a fire, despite Mr. McDaniel's having shown the Defendant how to do it on several occasions. Mr. McDaniel said that on one occasion after he informed the Defendant of an upcoming doctor appointment, the Defendant had wanted to bathe and get ready for the appointment two to three days before the appointment date.

Mr. McDaniel testified that he told the Defendant the purpose of the hearing was to determine the status of the Defendant's competency for trial. Mr. McDaniel said that the Defendant had not asked questions about "what happens in a court" or "what this case is about."

Mr. McDaniel acknowledged that the Defendant had previously had a smartphone, which the Defendant could use to browse the internet and play games. Mr. McDaniel said the Defendant had tried to use the phone to send text messages but that the messages had been hard to understand.

Mr. McDaniel acknowledged that he had heard about the Defendant's gambling at a casino when taken by other family members. Mr. McDaniel acknowledged that he had not objected at the Defendant's wedding to the victim's mother on the basis of the Defendant's incompetency to exchange the oath of marriage, but Mr. McDaniel said he had explained his concerns to the victim's mother but not to the officiant before the wedding.

Mr. McDaniel, who worked as a logger, testified that he used to take the Defendant with him to work. Mr. McDaniel said the Defendant stood and watched but did not work.

Ellen Summey, the Defendant's aunt, testified that she was present when the Defendant obtained his driver's license twelve years earlier. She said that he failed the test on five previous attempts and that an employee at the driver's license office helped the Defendant on his sixth attempt, when he obtained a passing score. Ms. Summey said the employee showed the Defendant pictures and read things to him. Ms. Summey said she or her sister helped the Defendant prepare for the driver's license examination for two to three hours each time before he attempted to take the examination and agreed that after about fifteen hours of studying and training, he had been able to pass the test with help.

Ms. Summey testified that she had ridden with the Defendant, whom she said drove "kind of hard sometimes," rather than braking and accelerating smoothly. She said the Defendant was allowed to go to a convenience store near home and to Walmart if someone went with him. She said that she had been to Walmart with him and had to count money for him if he purchased something.

Christopher Webb testified that when the Defendant was age seventeen and Mr. Webb's daughter was age thirteen, Mr. Webb asked the Defendant to drive Mr. Webb's daughter to a high school activity. Mr. Webb said that after they left, he spoke to the Defendant by telephone and learned that Mr. Webb's daughter had tried to give the Defendant directions but that the Defendant had insisted he was older and knew how to get there. Mr. Webb said that his daughter had been correct about the directions and that Mr. Webb had to explain the directions to the Defendant because the Defendant would not listen to Mr. Webb's daughter.

Mr. Webb testified about an occasion on which he borrowed $10 from the Defendant. Mr. Webb said he received a $10 bill and later attempted to repay the Defendant with two $5 bills. Mr. Webb said the Defendant had objected that Mr. Webb was repaying him too much because Mr. Webb offered two bills in repayment.

Linda Ghorley testified that the Defendant's "son" had attended a preschool where she was employed. Other evidence showed that she was referring to the victim. She said that she had called the Defendant to come to the school if the child had been sick or if the school "had a special thing." Ms. Ghorley said the Defendant had been able to complete tasks such as filling water balloons, although he had taken longer to complete the task than other parents, and filling a container with water. She said she spoke to the Defendant, whom she had understood as being "a little delayed," in the same manner as she would when "talking to the kids." She agreed that she had "basically . . . taught" the Defendant how to perform tasks and that he was capable of learning the tasks she gave him. She described the Defendant as a good father.

Francis McDaniel, the Defendant's grandmother, testified that although the Defendant loved to complete tasks for family members, he was forgetful. She said she had other grandchildren who were high school graduates and that the Defendant's memory was "a lot slower" than their memory. She recalled an incident in which she asked the Defendant to help her retrieve chicken feed from her car and said he "got halfway to the porch" and stopped "like his mind was in a daze." She said she had to prompt his memory of what he was supposed to be doing.

Ms. McDaniel was unaware of any efforts by the Defendant's family to enroll him in a vocational training program. She did not think he would be able to hold a job.

At this point, the hearing was adjourned. In the interim, the trial court entered an agreed order, whereby the parties stipulated and the court found by clear and convincing evidence "[t]hat the Defendant should be subject to further 'competency training.'" The court ordered DIDD to provide the Defendant with additional training and ordered the Defendant to attend the training. At the completion of the training, Shannon Westerman, a DIDD Behavioral Services Provider, opined in a written report that the Defendant was

competent to stand trial, with the recommendation that the Defendant be allowed additional time to answer questions and to confer with defense counsel and that open-ended questions be posed in simple language. She noted in the report that the Defendant had been diagnosed in 2009 with "mild mental retardation," which she opined was consistent with his adaptive behavior functioning.

Approximately two months later, the trial court reconvened the hearing to determine the status of the Defendant's competency to stand trial.

DIDD employee Shannon Westerman, a State's witness and an expert in competency assessment and competency training, testified that she reviewed the reports of the DIDD's previous competency training of the Defendant and the reports of the other experts who had rendered opinions in the present case. Ms. Westerman agreed that the documents she reviewed consistently indicated that the Defendant had "limited intellectual capacity."

Ms. Westerman testified that she provided the Defendant's more recent competency training. She said she met with the Defendant thirteen times, beginning in September 2018 and concluding in February 2019. She said each session lasted one to one and one-half hours. She said that she asked the Defendant questions, which he answered, and that she asked for further explanation if she needed it. She said they did role-play exercises to determine if the Defendant could prepare for court or how he might act in court. She said that her training was based upon a manual and that she went through each of the five modules in the manual with the Defendant three times. She said the Defendant "did well" during these activities. She said she conducted an evaluation of the Defendant at their last meeting, from which she concluded that the Defendant had "the present ability to consult with his Attorney with a reasonable degree of rational understanding, and a rational, as well as factual understanding of the proceedings against him."

Ms. Westerman testified that the Defendant's qualification for Social Security Disability benefits was not determinative of his competency to stand trial because the former was determined based upon his inability to work, not his understanding of legal proceedings. She said that a person's receiving disability benefits was not determinative of whether they were capable of learning.

Ms. Westerman testified that the Defendant often initially responded to questions by saying "I don't know," and "I don't know much." She said, however, that when given a prompt to respond and additional time, he was able to answer simply worded, open-ended questions. She said that he sometimes needed one to two minutes to think before answering a question and that he should not be pressured to answer. She said he needed additional time to think or to confer with his attorney. In her opinion, he did not have difficulty understanding questions, but he had difficulty forming a response. She said the Defendant

-14-

had limits in his speech and language, but she did not consider them "substantially compromised."

Ms. Westerman testified that, based upon the training she conducted with the Defendant, she disagreed with Mason Currey's 2009 report stating that the Defendant could not "effectively understand, remember, concentrate and persist for even simple tasks." In Ms. Westerman's opinion, the Defendant was capable of working, notwithstanding her knowledge that he received disability benefits. She said, "I don't disagree that he needed special education."

Ms. Westerman's report reflected the following: The Defendant's pre-assessment, as measured by the CAST-MR, an assessment tool for gauging competence to stand trial for individuals with intellectual disability, was forty-one of fifty points, which placed him four points above the mean of thirty-seven points for persons with intellectual disabilities who are competent to stand trial. After completing the Slater Method training module for competency to stand trial, the Defendant scored forty-seven out of fifty on the CAST-MR. The report also states:

> [The Defendant] appears to have an understanding regarding the court process, the allegations and charges against him, possible pleas, potential penalties, the adversarial nature of the court, appropriate behavior in the courtroom, and the roles of the court room personnel. He has demonstrated an ability to retain and explain this information over time, and he also exhibited the capacity to question and to understand concepts with which he was not familiar. It is concluded that [the Defendant] has the present ability to consult with his attorney with a reasonable degree of rational understanding and [has] a rational as well as factual understanding of the proceeding against him. It is the opinion of this examiner that [the Defendant] appears to be competent to stand trial at this time based upon the Tennessee standards.

Kathryn Smith, PhD, a defense witness and an expert in forensic competence and psychology, testified that she conducted a competency evaluation of the Defendant about one month after his second DIDD competency training. She said the evaluation occurred on one date and lasted about three and one-half hours. She said she received information from defense counsel's office regarding defense counsel's perceptions of the case and the Defendant's capability.

Dr. Smith said she relied, in part, on the results of extensive prior testing of the Defendant and that she conducted some additional testing related to memory, suggestibility, and competency. She noted that the Defendant's IQ test scores ranged from 57 to 61. She said that when she read a story to the Defendant and asked him immediately

-15-

afterward to tell the story to her, he recited a story which "bore very little resemblance to the story that he had heard." She said the Defendant introduced new facts which had not been in the story she had recited, that he incorrectly stated names and details of the story, and that he did not remember some parts of the story. She said that when she asked the Defendant twenty minutes later to recite the story a second time, he was unable to remember anything. She scored him at or below the first percentile on a normative basis, meaning 98 to 99% of people who took the test would outperform him. She said the Defendant's memory was poor, even when compared to others with his same IQ. She said she then administered a recognition test based upon the story, which was generally easier, and that the Defendant answered "yes" to each of the thirty questions. She said she scored him in the second percentile, which she said was the lowest possible score for this test. She said "I don't know" was an available option but that the Defendant "just said, yes, with conviction." She said the Defendant's performance was consistent with Dr. Engum's previous determination that the Defendant's memory function was severely to profoundly impaired.

Dr. Smith testified about the Defendant "confabulation" in a manner consistent with the testimony she later gave at the trial. Dr. Smith testified that the Defendant "fell for" all of the leading questions on a test to measure suggestibility. She said that when she applied pressure by asking him to try harder to give correct answers, he persisted in providing the same responses to the leading questions. She described his response style as responding "yes" reflexively to leading questions. She said he scored above the ninety-fifth percentile in "falling for" leading questions.

Dr. Smith said she reviewed Ms. Westerman's report and that she agreed with many of Ms. Westerman's findings. Dr. Smith, however, disagreed with Ms. Westerman on the following points: Dr. Smith found the Defendant deficient in his abilities to consult and assist his counsel; to describe accurately the approximate dates, circumstances, and his version of the alleged offenses; and to relate the facts and circumstances which should be shared with his counsel. Dr. Smith concluded that the Defendant was not able to (1) "remember events of importance, and disclose pertinent facts surrounding the alleged offense;" (2) "follow testimony for contradictions or errors, and to challenge prosecution witnesses;" and (3) "testify relevantly, and be cross examined."\ In Dr. Smith's opinion, the Defendant was not competent to stand trial.

After receiving the evidence, the trial court found that the Defendant had not shown by a preponderance of the evidence that he was incompetent to stand trial. The court found that appropriate measures to ensure the Defendant received a fair trial, in view of his "known and recognizable deficiencies," included (1) permitting the Defendant to have a family member sit in court with him to assist in the defense, (2) allowing the Defendant time to respond if he chose to testify, (3) the court's use of simple language, (4) permitting the jury to know in the event the Defendant testifies that he is highly suggestible, (5)

permitting frequent breaks without attributing the need for them to the defense and allowing defense counsel time to confer with the Defendant during the breaks.

The record reflects that during the trial, the trial court took regular breaks and was responsive to defense counsel's requests regarding the length of breaks and that the Defendant's father sat at the defense table during the trial in order to help ensure the Defendant could hear and understand the proceedings. The trial court conducted a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), at which the Defendant testified that he understood his right to testify as a witness or to choose not to testify, that he understood that the choice was his and not someone else's, that he had discussed the matter with defense counsel and the Defendant's father, and that he had chosen not to testify. Both defense counsel and the court questioned the Defendant. When the court asked the Defendant if he had any doubt he had made the correct decision in choosing not to testify, the Defendant responded, "No, ma'am." The court found that the Defendant "knows and understands what he's doing" and that the Defendant had spoken with his counsel in making the decision.

At the hearing on the motion for a new trial, the trial court stated that it had considered the totality of the evidence offered by the parties, including the findings of the experts who had evaluated the Defendant and the video recording of the Defendant's pretrial statement, before reaching the conclusion that the Defendant, despite his intellectual disability, was competent. The court stated that it

> fashioned that process that was highly unusual, [to ensure that if the Defendant] had any problems understanding or appreciating anything that was done in the trial, . . . he would have the assurance of his father . . . to be a sounding board for him, to react to . . . any questions counsel might have for input and to be sort of like an extra guard on [the Defendant's] rights.

Both the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a trial of a mentally incompetent criminal defendant. *State v. Reid*, 164 S.W.3d 286, 306 (Tenn. 2005) (citing *Pate v. Robinson*, 383 U.S. 375 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). In order to be competent to stand trial, a defendant must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975); *see Dusky v. U.S.*, 362 U.S. 402, 402 (1960). A defendant is presumed to be competent, and a defendant who claims incompetence for trial has the burden to demonstrate such incompetence by a preponderance of the evidence. *Reid*, 164 S.W.3d at 306-07. A trial court's determination regarding a defendant's competence to stand trial is conclusive on appeal unless the evidence preponderates to the contrary. *Id.* at 306.

The Defendant argues that the trial court reached an incorrect conclusion from the evidence and that the accommodations the court provided at the trial did not remedy the Defendant's alleged incompetency. The State responds that the evidence does not preponderate against the court's determination that the Defendant was competent for trial.

The record reflects that initially, the Defendant underwent competency training both in the general sessions court and in the trial court. The trial court conducted a lengthy competency hearing, at which the court received extensive evidence about the Defendant's intellectual disability and about his ability to function in everyday life and in a criminal proceeding. Ms. Westerman, the expert who conducted the more recent competency training over the course of thirteen one- to one-and-one-half-hour sessions, provided detailed information about the Defendant's abilities and deficits and about the training he completed with her. The competency training she provided involved understanding and preparing for the trial proceedings, and her report detailed the Defendant's areas of proficiency related to understanding and participating in legal proceedings. She had reviewed the reports of the other providers who had evaluated the Defendant. Based upon the information available to her, her own evaluation, and her training sessions with the Defendant, she determined that he was able to consult with his attorney with a reasonable degree of rational understanding and that he had a rational and factual understanding of the criminal proceedings against him. She noted that the Defendant was able to understand questions but needed extra time to respond. Dr. Smith, a defense expert, evaluated the Defendant after he completed his training with Ms. Westerman and reached the conclusion that the Defendant was not competent to stand trial. In Dr. Smith's opinion, the Defendant's deficits in his ability to remember important events and to disclose pertinent facts related to the case, to follow testimony, and to testify and be cross-examined rendered him incompetent for trial.

The trial court found that the Defendant had not carried his burden of showing by a preponderance of the evidence that he was incompetent to stand trial. Mindful of the Defendant's right to a fair trial and of the Defendant's "memory deficiencies," the court provided modifications for the trial proceedings in an effort to accommodate the Defendant. *Cf. State v. Leming*, 3 S.W.3d 7, 16 (Tenn. Crim. App. 1998) (stating that "amnesia, in and of itself does not constitute incompetency too stand trial" and considering whether the defendant can receive a fair trial despite the amnesia). The modifications included allowing a family member, who ultimately was the Defendant's father, to sit at the defense table to assist the Defendant, allowing defense counsel ample time to confer with the Defendant, and the court's use of simple language during the trial. As the court noted at the hearing on the motion for a new trial, the presence of the Defendant's father at the defense table provided extra protection to ensure that the Defendant's father was able to assist the Defendant in communicating with defense counsel and understanding counsel and the proceedings. The trial transcript does not reflect that the court curtailed the

-18-

opportunity for defense counsel and the Defendant to confer as needed, and it does not reflect that the court used overly complex language during the proceedings.

The Defendant analogizes his situation to that of the defendant in *State v. Benton*, 759 S.W.2d 427 (Tenn. Crim. App. 1988). In *Benton*, the defendant had an IQ of 47. The *Benton* defendant, who had been diagnosed with "moderate mental retardation," had the self-help skills of a five- to six-year-old child; had poor communication skills; could not read, write, or count; had been nonverbal until age ten; had attended only a few days of school; lived with his parents; was not allowed to go anywhere alone; and could understand only simple verbal instructions. *Benton*, 759 S.W.2d at 429-31. The psychiatric professionals who evaluated the defendant's competency opined that he did not understand the legal process or the charges he faced, that he was unable to assist in the preparation of his defense, and that he was unable to participate in his defense. *Id.* This court reversed the trial court's determination that the defendant was competent to stand trial, holding that the evidence preponderated against the trial court's ruling. *Id.* at 431.

We are unpersuaded that *Benton* is factually similar to the present case. The Defendant in the present case successfully completed competency training twice. The Defendant's IQ of 61 placed him in the mild intellectual disability range. Although the Defendant required assistance from his family, he had for a time lived in a separate home with his wife and stepson, was able to drive, had obtained a special education diploma, and was able to complete some self-care and household tasks. The State's and the Defendant's experts disagreed about whether the Defendant was competent for trial. The Defendant had the burden of proof, and the trial court credited the evidence showing the Defendant's competence over the contrary evidence offered by the defense.

The evidence does not preponderate against the trial court's determination that the Defendant was competent to stand trial. The record reflects that the court considered all of the evidence and determined that the Defendant failed to establish incompetency by a preponderance of the evidence. Further, the court provided multiple accommodations in view of the Defendant's functional limitations. Because the record supports the court's determination, its ruling is conclusive on appeal. *See Reid*, 164 S.W.3d at 306-07. The Defendant is not entitled to relief on this basis.

## II

### Denial of Motion to Suppress the Defendant's Pretrial Statement

The Defendant contends that the trial court erred in denying the motion to suppress his pretrial statement given at the sheriff's department because the State failed to show that he knowingly, voluntarily, and intelligently waived his *Miranda* rights. The State counters that the court properly denied the motion. We agree with the State.

-19-

The record reflects that the Defendant sought suppression of two pretrial statements. The first statement took place at the Defendant's house at the time of his arrest, and at a hearing, the trial court suppressed this statement. The second statement, which is the subject of the present issue, occurred after the Defendant was arrested and taken to the sheriff's department. The court denied the motion to suppress the second statement.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered voluntary, a statement must not be the product of "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id*. The essential inquiry is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined [.]" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). "The

State has the burden of proving the voluntariness of the confession by a preponderance of the evidence." *State v. Willis*, 496 S.W.3d 653, 695 (Tenn. 2016).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

A defendant's intellectual disability is among the factors to be considered in a trial court's evaluation of the totality of the circumstances. *Blackstock*, 10 S.W.3d at 208. "As one court has said, 'no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] so waive, the constitutional rights embraced in the *Miranda* rubric.'" *Id.* (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)).

At the suppression hearing, Lieutenant Martin testified that after he spoke with the victim at the hospital, he went to the Defendant's house. Lieutenant Martin said Officer John Acuff accompanied him. Lieutenant Martin said he spoke to the Defendant in the driveway. Lieutenant Martin said he read a *Miranda* waiver form to the Defendant, who signed the form. Lieutenant Martin said he then questioned the Defendant, whose speech was "fairly normal" for the Defendant's community but was "poor English" which showed "some kind of lack of education." Lieutenant Martin said that he informed the Defendant about the victim's allegations of sexual assault involving oral penetration and that the Defendant agreed the assault had occurred. Lieutenant Martin said that when the Defendant began giving detailed information, Lieutenant Martin stopped the interview in order to "get [the Defendant] in front of a camera at the sheriff's department to talk about

these things." Lieutenant Martin arrested the Defendant, and Officer Acuff took the Defendant to the jail.

Lieutenant Martin testified that he recorded his initial conversations with suspects "[a]bout 99 percent of the time" but that he did not remember recording the conversation with the Defendant before the arrest. Lieutenant Martin said he had searched for three and one-half weeks for a recording of the conversation but that he had not found one. He said he would have provided a copy of the recording to the sheriff's department as part of the case file.

Lieutenant Martin testified that he made a case file and copied the case file. He said his sheriff's department employment was terminated fourteen days after the Defendant's arrest. Lieutenant Martin said that his position had been eliminated and that he gave the original case file to Travis Jones. Lieutenant Martin said he had no information regarding what happened to the original case file thereafter and that he had been unable to locate the copy of the file at his home.

Defense counsel stated that the Defendant's signed *Miranda* waiver form, a drawing of a penis which was used during the custodial interview, a written statement, investigative notes, and a "time chart," all of which would have been in the case file, had not been provided to the defense in discovery. The prosecutor stated that he had asked the sheriff and Investigator Jason Philyaw to attend the suppression hearing but that they were not present in the courtroom.

Lieutenant Martin testified that after the Defendant was booked into the jail, Lieutenant Martin interviewed him in the presence of two DCS employees. Lieutenant Martin said he read the *Miranda* rights to the Defendant from a waiver form, which he identified as the same waiver form the Defendant had signed at his house. Lieutenant Martin said that the Defendant stated he understood his rights and that no one threatened or did anything to compel the Defendant to talk to him.

At defense counsel's request, the trial court took judicial notice of the evidence received at the competency hearing.

After receiving the evidence, the trial court suppressed the evidence obtained in the Defendant's first statement. The court ruled that because the State could not produce the *Miranda* waiver form about which Lieutenant Martin testified the Defendant signed at the house and any notes created by Lieutenant Martin, the court was unable to determine whether the Defendant was properly advised of his rights. The court said that the officers could testify that they went to the Defendant's house, spoke with him, and took him into custody. At the hearing on the motion for a new trial, the court expanded on its ruling, stating that it had credited Lieutenant Martin's testimony that he read the *Miranda* rights

to the Defendant and had the Defendant sign the form, but that without the form, the court had been unable to determine whether the Defendant had been properly advised of his rights before giving the first statement at his house.

The trial court denied the motion to suppress the second statement, which was given at the sheriff's department. Based upon the evidence at the hearing, the court found that the Defendant intelligently, knowingly, and voluntarily waived his rights and chose to give a statement. Addressing the Defendant's concerns about the manner in which the Defendant was advised of his rights, the court found that the advice of rights had been "effective," but that "[Lieutenant Martin's] performance did not comport . . . with how *Miranda* forms should be read to any defendant let alone a defendant with intellectual disabilities." The court found, though, that Lieutenant Martin had not received information which caused him to conclude that the Defendant had an intellectual disability or "needed greater instructions." The court found that although it "was . . . not clear as to the exact wording of the *Miranda* rights given," the *Miranda* requirements were met. The court stated that the video recording of the second statement should be redacted to omit references to the first statement.

The defense moved for reconsideration of the denial of the motion to suppress the second statement on the basis that the *Miranda* warning had been defective in that it failed to inform the Defendant that he could remain silent and that he could invoke his right to remain silent at any time. The video recording reflects that the *Miranda* warning Lieutenant Martin gave advised the Defendant, in pertinent part, "You have the right to remain silent. . . . If you decide now to talk without a lawyer present you may request a lawyer at any time and the questions will stop." The Defendant argued that the warning, as given, was defective because the last sentence advised the Defendant that once he began speaking with law enforcement, he could only invoke his right to remain silent by requesting an attorney. The trial court was unpersuaded, finding that "although not 100 percent in compliance with the *Miranda* forms that are typically used, [the advice given] is in compliance with the *Miranda* warnings that come out of *Miranda versus Arizona*."

The Defendant argues that the evidence preponderates against the trial court's determination that he knowingly, voluntarily, and intelligently waived his rights and gave a statement. He points to the evidence of his intellectual disability and to the language of the *Miranda* rights read to him, which he alleges was deficient.

The record reflects that when Lieutenant Martin advised the Defendant of his rights at the sheriff's department, the Defendant stated that he understood his rights. His demeanor was consistent with his statement that he understood. He was cooperative, provided information, and asked for clarification during the interview. At times, he corrected Lieutenant Martin's assertions about the factual allegations.

-23-

The Defendant lived in a separate home with his wife and stepchild at the time of the offenses, was able to complete some tasks independently and others with the assistance of family members, drove, had received a special education high school diploma, appeared cooperative and was able to communicate without difficulty on the recording of the interview. He said he understood his rights and did not exhibit any behavior which would indicate otherwise.

Although the Defendant argues that the *Miranda* rights warning given at the sheriff's department was defective, the trial court disagreed. *Miranda* does not dictate a precise formulation of the words to be used in advising a defendant of his rights. *See California v. Prysock*, 453 U.S. 355, 359 (1981); *State v. Davidson*, 509 S.W.3d 156, 192 (Tenn. 2016) ("*Miranda* does not mandate a 'talismanic incantation' or precise formulation of the warnings."). Rather, the warning must reasonably convey the defendant's rights. *Davidson*, 509 S.W.3d at 192 (citing *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). As applied to the facts of the present case, the first sentence of the *Miranda* warning given at the sheriff's department advised the Defendant that he had the right to remain silent, without any condition that he must first request to speak to an attorney.

The Defendant was advised of his rights. He indicated his understanding of them and his agreement to be interviewed. He cooperated during the interview, at times providing detailed explanations. He asked about the meaning of words he did not understand. The evidence does not preponderate against the trial court's determination that he knowingly, voluntarily, and intelligently waived his rights. The trial court did not err in denying the motion to suppress the statement the Defendant gave at the sheriff's department.

The Defendant is not entitled to relief on this basis.

## III

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his three rape of a child convictions. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate

-24-

courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

However, "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti[.]" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). "Corpus delicti is the body of the crime - evidence that a crime was committed at the place alleged in the indictment." *Van Zandt v. State*, 402 S.W.2d 130, 136 (Tenn. 1996). "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

Our supreme court clarified the corroboration requirement in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014). Pursuant to the modified trustworthiness standard, "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Bishop*, 431 S.W.3d at 58 (quoting *State v. Lucas*, 152 S.2d 50, 60 (N.J. 1959)). In other words, if the offense involves tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id*. at 59. If, however, the offense does not involve a tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime." *Id*. The court noted that offenses that do not involve a tangible injury "may include inchoate crimes, certain financial crimes, status crimes, and sex offenses lacking physical evidence and a victim who can testify." *Id*. at 59, n.28. The substantial independent evidence "must corroborate essential facts contained in the defendant's statement," regardless of whether a tangible injury occurred, and evidence corroborating "collateral circumstances surrounding the confession will not suffice to establish trustworthiness." *Id*. at 59-60.

At the time of the offenses in this case, rape of a child was defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim

is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2018) (subsequently amended). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2018).

The record reflects that the trial court instructed the jury that the State had elected the following offenses:

Count 1:    "the alleged act [of] . . . anal penetration when the defendant penetrated the victim's anus with his penis"

Count 2:    "the alleged act of oral penetration of the victim by the defendant's penis on the first night as described by the defendant on the video"

[Count 3:  motion for judgment of acquittal granted]

Count 4:    "the alleged act of penetration of the defendant's mouth by the victim's penis on the second night as described by the defendant in the video"

The Defendant argues that evidence is insufficient because his inculpatory statement was not adequately corroborated by other evidence. He also argues that the video recording of his statement was inadmissible and should not be considered.

We begin with the Defendant's argument regarding the admissibility of his recorded statement. As we discussed in Section II, the trial court did not err in denying the motion to suppress the evidence of the recorded statement. When reviewing questions of the sufficiency of the evidence, an appellate court properly considers all of the evidence admitted at the trial, even if some of the evidence was erroneously admitted. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981). Because the recorded statement was part of the evidence considered by the jury, we will consider it in evaluating the sufficiency of the evidence to support the convictions.

Viewed in the light most favorable to the State, the evidence related to Count 1, rape of a child involving anal penetration of the victim by the Defendant, shows that the victim was age five in May 2015. In his statement, the Defendant said he penetrated the victim's anus with the Defendant's penis on the second night of the abuse. The Defendant indicated on a drawing the portion of his penis which he had inserted into the victim's anus. Ms. Taylor testified that when the victim was at the hospital, he reported that anal penetration

had occurred and that his stepfather, whom other evidence showed was the Defendant, had been the perpetrator.

The Defendant argues that the victim did not testify about anal penetration and that the victim did not tell Dr. Jeffero about anal penetration. However, the Defendant admitted he had anally penetrated the victim, and his statement is corroborated by Ms. Taylor's account of the victim's having reported anal penetration to her at the hospital and by the victim's identification of the Defendant as the perpetrator. The evidence is sufficient to support the conviction in Count 1.

Regarding Count 2, which involved oral penetration of the victim with the Defendant's penis, the victim testified that when the Defendant began sexually abusing him, the Defendant removed the victim's underwear and sucked the victim's penis and made the victim suck the Defendant's penis. In the recorded statement, the Defendant admitted he had inserted his penis into the victim's mouth, and the Defendant marked on a drawing the portion of his penis which he had inserted into the victim's mouth. The Defendant said he and the victim performed oral sex on each other in the "first night" of the abuse. The victim reported oral penetration to Ms. Taylor and identified his stepfather, the Defendant, as the perpetrator. The victim's testimony and statements to Ms. Taylor provide adequate corroboration of the Defendant's inculpatory statement. The evidence is sufficient to support the conviction in Count 2.

Regarding Count 4, which involved oral penetration of the Defendant's mouth by the victim's penis, the victim testified that the Defendant performed fellatio on the victim. At the hospital, the victim reported oral penetration to Ms. Taylor and identified his stepfather, the Defendant, as the perpetrator. The Defendant said in his recorded statement that he performed oral sex on the victim on the "second night." The victim's and Ms. Taylor's testimony provide adequate corroboration of the Defendant's inculpatory statement. The evidence is sufficient to support the conviction in Count 4.

Because the evidence is sufficient to support the convictions, the Defendant is not entitled to relief on this basis.

## IV

## Election of Offenses

The Defendant contends that the trial court erred in permitting the State to elect offenses described by the Defendant in his recorded statement at the sheriff's department, which he contends was erroneously admitted. He argues that, in the absence of the recording, the victim's testimony did not identify discrete allegations of offenses upon

which the State could make an election. The State counters that the election was proper. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g.*, *State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007).

Our supreme court has stated,

The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt. The election must be made at the conclusion of the State's case-in-chief. The election requirement "augment[s] the general unanimity instruction" and serves to ensure that the jury understands its obligation to agree unanimously that the defendant committed the same criminal act before it may convict the defendant of a criminal offense. Were the State permitted to present proof of many criminal acts that all allegedly occurred within the time period covered by the charging instrument, but not required to make an election of offenses, juror unanimity would be compromised because nothing would prevent jurors from "reach[ing] into the brimming bag of offenses and pull[ing] out one for each count."

The election doctrine also assists the defendant in preparing for and defending against the specific charge, protects the defendant from double-jeopardy concerns, "enables the trial judge to review the weight of evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence." Nevertheless, as this Court has previously emphasized, the most important purpose served by the election of offenses doctrine is to "ensure that the jurors deliberate over and render a verdict based on the same offense . . . ."

*State v. Qualls*, 482 S.W.3d 1, 9-10 (Tenn. 2016) (internal citations omitted).

Relative to an election of offense,

[T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the [S]tate's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the [S]tate must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

The essence of the Defendant's complaint is that, without the evidence of his recorded statement, the victim's testimony was uncorroborated and insufficient to support the convictions. As we concluded in Section II, the trial court did not err in denying the Defendant's motion to suppress the evidence of the Defendant's recorded statement. We

note that the Defendant has not cited any evidence to support his contention that evidence which an appellate court determines is inadmissible may not be considered in determining whether the State provided an adequate election of the offenses. *Cf. Longstreet*, 619 S.W.2d, at 100-01 (holding that appellate review of the sufficiency of the evidence includes any erroneously admitted evidence).

The record reflects that the Defendant described in his statement each event which formed the basis of the State's election in sufficient and distinct detail. He described one instance in which he performed anal sex on the victim. He said that he received oral sex from the victim on the "first night" and that he performed oral sex on the victim on the "second night." The State's election for the the two counts involving oral sex specifically referred to the incidents described by the Defendant in his statement. As we noted in Section III, the State provided adequate corroboration of each elected incident.

We conclude that the State provided an adequate election of the offenses from which the jury could reach a unanimous verdict regarding the question of the Defendant's guilt of the charged offenses. *See Adams*, 24 S.W.3d at 294. The Defendant is not entitled to relief on this basis.

## V

## Admission of Evidence

The Defendant contends that the trial court abused its discretion in admitting the victim's great-grandmother's testimony regarding her reaction to the victim's revelation of sexual abuse. The Defendant argues that the evidence was irrelevant and that, contrary to the court's ruling, it did not qualify for admission pursuant to Tennessee Rule of Evidence 803(3) (then existing mental, emotional or physical condition). The Defendant argues, alternatively, that even if the evidence was admissible, it should have been barred as unfairly prejudicial pursuant to Rule 403. The State counters that the Rule 403 issue is waived. Alternatively, the State argues that the court did not abuse its discretion. We agree with the State that the court did not abuse its discretion in admitting the evidence.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

During the victim's great-grandmother's testimony, the prosecutor asked if the victim told her something, and she said he had. The prosecutor asked, "[H]ow did that affect you emotionally?" Defense counsel objected, and the basis of his objection is recorded as "(indiscernible)" in the trial transcript. The court asked the prosecutor to explain why the evidence was admissible, and the prosecutor responded that the evidence was relevant. The court then stated that the evidence would be admissible pursuant to Rule 803(3), the hearsay exception for a witness's then-existing emotional state. The victim's great-grandmother then testified that she felt "crushed" after hearing the victim's statement and that she "bent down on [her] knees and . . . held him." She said that after holding the victim for a time, she called her daughter because she did not know what to do and that her daughter came to her house.

The Defendant raised the issue in the motion for a new trial. The written motion did not state the basis upon which the Defendant claimed the court had erred in admitting the evidence, but at the hearing, defense counsel argued that the evidence was not relevant.

We begin with the State's argument that appellate consideration of the issue is waived because an objecting party has an obligation to state the basis upon which the objection has been made and that failure to do so results in waiver of the issue on appeal. *See, e.g.*, *State v. Weeden*, 733 S.W.2d 124, 126 (Tenn. Crim. App. 1987); *see also* T.R.A.P. 3(e). Although the transcript of the trial does not reflect the specific basis upon which the defense objected, it reflects that defense counsel said something which was indiscernible to the court reporter, which we infer was the basis for the objection. In response, the State argued that the evidence was relevant. At the hearing on the motion for a new trial, defense counsel argued that the evidence should have been excluded because it was not relevant. The trial court stated that the evidence "ha[d] little relevance," that it did not specifically recall the testimony, and that a person's statement about how the person reacted to a victim's revelation was "just how people explain what has happened." To the extent that the record reflects that the defense made a specific objection based upon relevance, we decline to treat the issue as waived. We decline, however, to consider the Defendant's argument that the evidence was unfairly prejudicial and should have been excluded pursuant to Rule 403 on that basis, as the record does not reflect an objection on this basis in the trial court.

As we have stated, the trial court ruled that the evidence was admissible pursuant to Rule 803(3), which is the hearsay exception for a declarant's then-existing state of mind. By its terms, Rule 803(3) pertains to a prior statement of a declarant. *See* Tenn. R. Evid. 803(3). The evidence in question involved the victim's great-grandmother's recollection of her reaction to the victim's statement. It was not an in-court recitation of a declarant's out-of-court statement. As such, it was not hearsay, and an exception to the hearsay rule was not a proper vehicle for its admission. *See* Tenn. R. Evid. 801(c), 802. To the extent that the court admitted the evidence on this basis, the court abused its discretion.

The Defendant argues that the evidence was not relevant. At the hearing on the motion for a new trial, the trial court acknowledged the minimal relevance of the evidence. The import of the victim's great-grandmother's testimony was to show how the allegation first came to light and that the victim's great-grandmother took the victim's statement seriously, thereby precipitating the involvement of other family members, the victim's medical evaluation, and the investigation. Witnesses who testified immediately after the victim's great-grandmother explained the victim's family's actions after the victim made the statement to his great-grandmother. In this context, we cannot say that the trial court abused its discretion in admitting the evidence. The Defendant is not entitled to relief on this basis.

## VI

## Denial of Motion for a Mistrial

The Defendant contends that the trial court erred in denying his two motions for a mistrial during Lieutenant Martin's testimony. The Defendant argues that Lieutenant Martin's testimony, first, that he had a conversation with the Defendant when Lieutenant Martin arrived at the Defendant's house after speaking with the victim at the hospital and, second, that he charged the Defendant with "22 counts of aggravated child rape" each created manifest necessity for a mistrial. The State responds that the court did not abuse its discretion in denying the motions. We agree with the State.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

In the first instance of which the Defendant complains, the prosecutor asked Lieutenant Martin, "Without telling anybody what was said, did you have any conversations with the defendant when you got to that residence?" Lieutenant Martin responded, "Yes, sir," and the defense objected on the basis that the Defendant's statement at his home had been suppressed, moved for a mistrial, and alternatively asked the court to give a curative instruction. We note that the court ruled at the suppression hearing that the law enforcement officers could testify "that the went to the house, that they spoke to the [Defendant] and thereafter they took him into custody." No evidence was elicited regarding the specifics of the Defendant's statement in his driveway. Nevertheless, the court granted the Defendant's request for a curative instruction and told the jury to disregard the question and answer. The evidence was in compliance with the court's previous ruling at the suppression hearing, and the court applied the proper law in considering the motion, finding that no manifest necessity existed. It granted the Defendant's request for a curative instruction. Upon consideration, we conclude that the court did not abuse its discretion in denying the motion for a mistrial.

Second, the Defendant alleges the trial court abused its discretion in denying a mistrial after Lieutenant Martin testified about taking the Defendant's statement at the sheriff's department. The prosecutor asked Lieutenant Martin if he had charged the Defendant with any crimes, and Lieutenant Martin said he had. The prosecutor asked, "And what did you charge him with?" Lieutenant Martin responded, "I believe it was 22 counts of aggravated child rape." The defense moved for a mistrial. The court found that manifest necessity did not exist, denied the motion, and gave the jury a curative instruction which advised the jurors that the State had the burden of proof, that it should disregard "anything that might have happened outside of the actions that are actually given to you for review," and that the only issue before the jury was whether the State met its burden of proof beyond a reasonable doubt as to the four counts of rape of a child charged in the indictment.

We acknowledge that evidence of other crimes or bad acts is generally inadmissible under Tennessee Rule of Evidence 404(b). While declining to mandate a rigid formula for all situations, our supreme court has outlined three nonexclusive factors which may be appropriate in considering whether manifest necessity exists for a mistrial:

> (1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive;
>
> (2) whether the trial court offered and gave a curative jury instruction; and
>
> (3) the relative strength or weakness of the State's proof.

*See, e.g., State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994).

In the present case, the State at least indirectly elicited this information by asking Lieutenant Martin to identify the offenses with which he charged the Defendant. That said, the Defendant was on trial for multiple incidents of sexual abuse against a single victim, and the jury was aware of the Defendant's admission in his statement to more incidents of sexual abuse against the victim than the four incidents for which he was on trial. The court gave a curative instruction for the jurors to disregard any evidence which was unrelated to the charges on trial. We presume that the jury followed the court's instructions. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006) ("The jury is presumed to follow its instructions."). Upon consideration, we conclude that the court did not abuse its discretion in denying the motion for a mistrial. The Defendant is not entitled to relief on this basis.

## VII

### Denial of Motion to Dismiss/*Ferguson* Instruction

The Defendant contends that the trial court erred in denying his motion to dismiss the prosecution based upon the State's inability to produce (1) documents and any recording related to the initial police encounter with the Defendant at the Defendant's house and (2) documents related to the Defendant's custodial interrogation at the sheriff's department. The State counters that the court acted within its discretion in denying the motion to dismiss and by giving an instruction regarding lost or destroyed evidence pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

-34-

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, a determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 915, 918). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

[T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Ferguson*, 2 S.W.3d at 917; *see Merriman*, 410 S.W.3d at 797 (reviewing a trial court's remedy for a *Ferguson* violation for abuse of discretion). A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791.

The Defendant filed a motion to dismiss based upon the State's failure to preserve the following evidence: (1) the *Miranda* waiver the Defendant signed at his house, (2) any record of any police questioning of the Defendant at his house, (3) the names and titles of persons present when the Defendant was interviewed, (4) the *Miranda* waiver read to the Defendant at the beginning of his interview, and (5) the diagrams and drawings created during the interview. By all accounts, the State could not produce the documents to the defense.

Because the motion to dismiss and the motion to suppress involved related facts, the trial court considered both issues at the same hearing. Thus, evidence and factual assertions of counsel relevant to this issue are recited in Section II.

As we also discussed in Section II, the trial court suppressed the evidence related to any statements the victim made at his house. Thus, the relevant inquiry relates to the missing evidence related to the second, custodial statement at the sheriff's department. In that regard, the court found that the State had provided the defense with a photograph of the penis drawing by producing a still photograph from the video recording of the Defendant's custodial statement, on which the drawing is visible. Regarding the other evidence in question, the court said, "[T]his case is ripe for a *Ferguson* jury instruction . . . that this document does not exist and that [the jurors] can impute that there would have been favorable evidence to the defendant by this lost evidence." The court found that the record was "void from any explanation as to what happened" to the missing evidence and that the sheriff's department had been "very negligent" in failing to fulfill its obligation to preserve the evidence but that intentional misconduct had not been shown. The court found that the video recording was a probative and reliable substitute for the missing evidence and "perhaps even more helpful than an officer's recollection of what someone heard." In addition to announcing its intent to give the *Ferguson* instruction, the court stated that "all of these deficiencies can be brought out to whatever degree the defense feels is necessary in the trial of this matter."

At the trial, the defense was permitted to cross-examine Lieutenant Martin about the missing documents and their contents. The trial court gave the *Ferguson* instruction.

At the motion for a new trial hearing, the Defendant alleged that the trial court erred in denying the motion to dismiss. In denying the Defendant's request for a new trial, the court noted that dismissal was not the only remedy available for lost or destroyed evidence. The court found that the other evidence, particularly the video recording of the Defendant's statement, was "inculpatory much more than exculpatory."

Because the missing evidence was related to the Defendant's statement about the offenses and the circumstances in which the intellectually disabled Defendant gave the statement, the State had a duty to preserve it. The trial court found and the record reflects that the State was highly negligent in failing to preserve the evidence. *See Merriman*, 410 S.W.3d at 785. Although the evidence was significant in that it pertained to the Defendant's inculpatory statement, the video recording was highly reliable other evidence to show the *Miranda* warning and the Defendant's waiver of his rights, the presence and actions of the individuals present during the statement, and the drawing on which the Defendant marked to show the depth of penetration involved in the charged offenses. *See id.* The other evidence at the trial, consisting of the testimony of the State's witnesses and the video recording of the Defendant's statement, provided overwhelming evidence of the

Defendant's guilt. *See id.* Upon consideration of the *Merriman* factors, we conclude that the Defendant was able to receive a fair trial despite the missing evidence. *See id.* Further, the Defendant received the benefit of the court's *Ferguson* instruction. The instruction informed the jury of the State's duty to gather, preserve and produce evidence and that if the jury found that the State had failed to fulfill its duty relative to evidence which more probably than not would benefit the Defendant, it could infer that the absent evidence was favorable to the Defendant. *See* T.P.I.—Crim. 42.23 (Duty to preserve evidence). We conclude that the trial court's denial of the motion to dismiss and its decision to give the *Ferguson* instruction were not abuses of discretion. *See id.* at 797. The Defendant is not entitled to relief on this basis.

## VIII

## Closing Argument

The Defendant contends that the State committed prosecutorial misconduct in closing argument which affected the verdict to his detriment. The State counters that the Defendant's contention that the prosecutor's closing argument improperly injected a racial issue into the trial is unsupported by the record. We agree with the State.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

In his closing argument, the prosecutor theorized that Dr. Jeffero had been less thorough than Ms. Taylor in their respective examinations of the victim at the emergency room. The prosecutor argued that Dr. Jeffero had testified to his belief that a five-year-old child "would understand the word or the idea of penetration" and that Dr. Jeffero "wrote that the child denied penetration based on his own standards." The prosecutor noted Dr. Jeffero's testimony that Dr. Jeffero had not asked the victim if he knew what penetration was and that Dr. Jeffero had written in his notes that the victim reported his genitals had been touched but that Dr. Jeffero had not provided details about what part of the Defendant's body had been used to touch the victim. In his argument, defense counsel attacked the State's argument that Dr. Jeffero had not been thorough. Defense counsel

-38-

challenged the proof of anal penetration for Count 1 on the basis that the victim did not testify about anal penetration and that the State produced no evidence that the victim had reported anal penetration to Dr. Jeffero. In his rebuttal argument, the prosecutor contended that the defense had mischaracterized Dr. Jeffero's testimony. The prosecutor argued that the evidence showed that Ms. Taylor had been thorough, spending time with the victim, whereas jurors could rely on their "own experience about how maybe a doctor comes breezing in" and speaks to a patient. The prosecutor argued that a five-year-old boy such as the victim "might clam up a bit" when a "tall and . . . large" man such as Dr. Jeffero entered the room, "especially after [the victim had] been talking to a really nice nurse like Ms. Taylor."

After the jury had retired to begin deliberations, defense counsel objected "to the racism of [the prosecutor] where he said a large (indiscernible) man in describing Dr. Jeffero who is clearly from his testimony an African-American and that this boy . . . had never been confronted with this situation." The prosecutor countered that the trial court should not conclude that the rebuttal argument had been racist because the prosecutor had not mentioned Dr. Jeffero's race. The court stated that the objection and response were noted for the record but did not address it further at this time.

When considering the issue at the hearing on the motion for a new trial, defense counsel acknowledged that the prosecutor had called Dr. Jeffero a "big, large man" and argued that the defense "considered [the argument] under the circumstance a racist argument." The court found that the argument had not been race-based and that the State had properly argued that the jury could infer that the young, small victim had been intimidated by the presence of a large man when the victim was seen at the emergency room.

The record reflects that the prosecutor did not mention Dr. Jeffero's race or improperly suggest that the victim had been intimidated by Dr. Jeffero's race. Upon consideration of the *Goltz* examples of improper closing argument, we conclude that the trial court did not err in concluding that the prosecutor's rebuttal argument had not been based upon improper racial grounds. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE